UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WILLIAM HARRISON SIMS,

    Plaintiff,

                                      Case No.: 6:22-cv-1685-PGB-EJK

v.

BMW OF NORTH AMERICA LLC and
BAYERISCHE MOTOREN WERKE AG,

    Defendants.

---

**PLAINTIFF'S *DAUBERT* MOTION TO EXCLUDE CERTAIN
OPINIONS AND TESTIMONY OF ROBERT C. LANGE
WITH INCORPORATED MEMORANDUM OF LAW**

---

Plaintiff, William Harrison Sims, through his undersigned counsel and pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and its progeny, hereby moves to exclude certain opinions and testimony offered by Defendants' proffered expert, Robert C. Lange.

## I.    BACKGROUND

This case arises out of the catastrophic and life-altering injuries Plaintiff, William Harrison Sims ("Sims"), suffered when a defective airbag inflator installed in his 2004 BMW 330Ci (the "subject BMW vehicle") ruptured, exploded, and shot metal shrapnel throughout the vehicle cabin during a collision, injuring him. Sims sues Defendants, BMW of North America LLC ("BMW NA") and

Bayerische Motoren Werke AG ("BMW AG") (collectively, "BMW"), in strict liability and negligence for their respective roles in designing, manufacturing, and distributing the subject BMW vehicle with the defective airbag inflator that caused his injuries.

At approximately 12:42 a.m. on October 24, 2019, Sims was driving the subject BMW vehicle when he was involved in a crash with a vehicle being driven by Tameca Nicole Harris-Jackson. During the collision, the front of the subject BMW vehicle struck the right front quarter panel of Ms. Harris-Jackson's vehicle. As a result of the crash, the subject BMW vehicle's front driver-side airbag was signaled to deploy. However, instead of deploying a protective airbag as intended, the subject BMW vehicle's front driver-side airbag detonated like a grenade and blasted metal fragments into Sims' head and face, causing extensive injuries.

Following a thorough investigation of the subject BMW vehicle and the incident, it was determined that the vehicle is defective through the incorporation of a defectively designed front driver-side airbag inflator. Specifically, the involved airbag inflator was defectively designed because of the use of phase-stabilized ammonium nitrate ("PSAN") as the airbag's propellant, which caused the inflator to rupture and explode in the subject BMW vehicle on the day of the incident. (Ex. B, p. 19). As Sims' airbag propellant and engineering expert, Robert Renz, Jr. ("Renz"), explains, PSAN suffers from two critical disadvantages that

make it defective and dangerous to use as an airbag propellant. First, PSAN expands when exposed to temperature fluctuations. Second, PSAN is hygroscopic, meaning PSAN readily absorbs moisture from the air. Combined, temperature fluctuations and moisture absorption result in PSAN degrading over time, which increases the chemical's surface area and, as a result, its ability and readiness to combust. PSAN that has sufficiently degraded due to temperature fluctuations and moisture absorption will cause the airbag inflator to over-pressurize and rupture in the event of airbag deployment. (*Id.* at pp. 9–17).

Worse, Renz explains that PSAN's defective and dangerous propensities have been well-known and understood by industry for several decades. In his report, Renz cites numerous articles, patents, and research going back to 1908 discussing ammonium nitrate's defects as well as the tendency of PSAN-based airbag propellants to cause inflator ruptures in vehicles upon airbag deployment. (*Id.* at pp. 9–17 & nn. 8, 11, 13, 14, 19–21). Further, through his experience in the industry (including with BMW specifically) and his review of BMW's engineering records for the airbag inflator used in the subject BMW vehicle, Renz explains that BMW knew about PSAN's defective condition and the dangers it posed as an airbag propellant when BMW made and sold the subject BMW vehicle in 2004. (*Id.* at pp. 1–4, 16–17, 19). Renz also reviewed relevant BMW testimony as well as communications made by and between BMW and the component manufacturer

for the inflator, which confirm BMW's long-standing knowledge of the defect and corporate decision-making to purposely not disclose the existence and true extent of the defect to the public. (*Id.* at pp. 18–19).

For their part, Defendants deny having known about the defective and unreasonably dangerous nature of PSAN for as long as Renz shows. To support their denial, BMW disclosed, Robert C. Lange ("Lange"), as an expert who intends to offer opinions including (1) that BMW did not know about PSAN's defective condition until 2014, and (2) that the component manufacturer of the defective PSAN-based airbag inflators may have provided false information to BMW about the inflators in order to deceive and/or defraud BMW.[1] (Ex. A). Through the instant motion, Sims moves to exclude these opinions as unreliable and unhelpful.

## II.    LEGAL STANDARDS

Federal Rule of Evidence 702 permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an opinion. For expert witness testimony to be admissible at trial, the witness must satisfy three criteria: (1) the witness must be qualified to offer his intended testimony, (2) the witness must have employed "sufficiently reliable"

---

[1]    It is worth noting Lange does not actually opine that the component manufacturer, Takata, provided false information to or attempted to deceive BMW specifically, and he agreed during his deposition that he has no evidentiary or factual basis for offering such an opinion. (Doc. 195, 59:6–9, 74:3–6, 75:7–10). Nevertheless, Sims expects BMW will attempt to make this unsupported connection at trial, which is why he moves to prohibit any such testimony by Lange now.

methods and principles to form his opinions, and (3) the witness' testimony must help the jury understand the evidence or decide an issue in the case. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir. 2005). This motion revolves around the second and third criteria.

To be sufficiently reliable, the witness' intended testimony must be "ground[ed] in the methods and procedures of science" and must emanate from "more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993). Reliability can be assessed by evaluating several factors, including (1) whether the expert bases his opinions on sufficient facts, (2) whether the expert unjustifiably extrapolates facts to reach an unfounded conclusion, (3) whether the expert considers or accounts for inconsistent or contradictory data, and (4) the extent to which the methods used rely on the expert's subjective interpretations. *See id.* at 593–94; Fed. R. Evid. 702 Advisory Committee notes to 2000 amendments. Where, as here, the expert relies primarily on experience in forming his opinions, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Augustin*, 661 F.3d 1105, 1125 (11th Cir. 2011).

To help the jury, expert testimony must provide assistance in understanding matters beyond the ken of the average lay juror or must allow the jury to resolve

a factual dispute in the case. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148–49 (1999). An expert's opinion must therefore be relevant to an issue in the case and must hold probative value that outweighs the concerns listed by Federal Rule of Evidence 403, such as unfair prejudice, potential jury confusion, and needless presentation of cumulative evidence. *Daubert*, 509 U.S. at 595.

District courts are obligated to apply *Daubert*'s factors and rigorously examine an expert's opinions to "ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Rink*, 400 F.3d at 1291. The party who offers expert testimony at trial ultimately bears the burden of proving its admissibility by a preponderance of the evidence. *Id.* at 1292.

## III.   ARGUMENT

### A.   About Lange and His Opinions.

Lange is a mechanical engineer by education and a long-time automotive industry insider and advocate by profession. (Doc. 195, 8:18–12:6). Lange started his career in 1969 with Ford Motor Company, where he worked until 1982 in various positions within Ford's fuel systems and exhaust systems departments. (*Id.* at 9:1–10:13). From 1982 to 1994, Lange worked for an expert witness consulting firm called Failure Analysis Associates (predecessor to his current firm, Exponent), where he forwarded the interests of vehicle manufacturers in the fields

of public policy research and safety defect investigation. (*Id.* at 10:13–21). In 1994, Lange transitioned to General Motors, where he worked until 2008 in various capacities relating to vehicle safety systems and integration of those systems in GM's vehicles. (*Id.* at 10:21–12:1). In late 2008, Lange rejoined Exponent, where he continues to work today as an expert witness and advocate for the automotive industry in the areas of safety defect investigation and product liability defense. (*Id.* at 11:25–12:6).

The firm Lange works for, Exponent, is itself an interesting creature. According to public records Exponent files each year with the U.S. Securities and Exchange Commission, Exponent's business is highly dependent on its continued retention by manufacturers and corporations in the chemical, construction, consumer products, energy, life sciences, and transportation industries, suggesting a need for Exponent to assuage those clients. (*See, e.g.*, Ex. C, pp. 3, 11). Consistent with that disclosure, a 2008 exposé of the defense consultancy industry to which Exponent belongs was unable to locate any reports or research conducted by Exponent's experts that did not support the conclusions and outcomes desired by the corporation or trade association that hired them. (Ex. D).[2] True to form, Lange testified at his deposition that all of his work at Exponent has been on behalf

---

[2]    Michaels, D. (2008). *Doubt is Their Product: How Industry's Assault on Science Threatens Your Health*, pp. 47–49. Oxford University Press.

of vehicle manufacturers like BMW and their supply base. (Doc. 195, 66:19–67:15).

As of his deposition date on June 28, 2024, BMW had paid over $120,000 for

Lange's work in this matter alone. (*Id.* at 60:3–61:21).

On June 3, 2024, Lange issued a report of his findings and opinions in this

case, with a decided Exponent slant in favor of the clients who hired him. (Ex. A).

According to Lange, he reviewed select documents that were provided to him by

BMW's counsel, including a crash report, discovery responses and deposition

transcripts, and other documents as reflected in his expert file directory. (Doc. 195,

42:1–22, 43:12–46:22; Ex. E). Pertinent to this motion, Lange states the following

opinions in his report based on his analysis of these materials:

> 75. I am unaware of any evidence showing BMW AG and BMW NA could have been aware air bag systems supplied by Takata to BMW AG were defectively designed prior to Takata's announcement of defect findings beginning in 2014.
>
> 76. As of the date of distribution of the Subject 2004 BMW 330Ci, by BMW NA, no motor vehicle manufacturer or distributor could have known of the technical research findings regarding the latent defect in Takata air bag inflators. The science was not settled until 2015 – 2016.

(Ex. B, p. 30; *see also* Doc. 195, 64:10–65:11).

In his report, Lange also makes the following statement:

> During the inflator development phases, Takata falsified data provided to vehicle manufacturers. When the false data was discovered, Takata failed to correct the false data by informing the manufacturer and correcting the record.

> Takata's false dealings with vehicle manufacturers evidently
> extended into 2015.

(Ex. B, pp. 21–22) (footnotes omitted). While Lange does not explicitly offer an opinion in his report relative to this statement, when asked at his deposition, Lange attempted to offer the opinion that, because Takata may have falsified information relating to defective airbag inflators it supplied to *other* vehicle manufactures, Takata did the same to BMW. (Doc. 195, 70:2–71:22, 74:12–75:1). The purpose of offering this opinion appears to be to undercut the idea that BMW knew about the defect at issue in this case and was, instead, tricked by Takata into using its inflators. Despite BMW's counsel's best efforts at cross-examining their own expert witness, Lange repeatedly admitted he has no idea whether such an opinion is true:

> Q. Do you know of any evidence suggesting that Takata falsified data with respect to BMW's Takata airbag modules?
>
> A. I don't know.

(*Id.* at 59:6–9).

> Q. As you sit here today, are you able to identify any document or record that was falsified by Takata and given to BMW with respect to inflators?
>
> A. I—I don't—no. I cannot.

(*Id.* at. 74:3–6).

> Q. Mr. Lange, can you say one way or the other whether you know of documents or information that Takata falsified and gave to BMW?
>
> A. I cannot.

(*Id.* at 75:7–10).

Sims moves to preclude Lange from offering both sets of opinions at trial because they are unreliable and unhelpful.

### B. Lange's Opinion that BMW Did Not Know About the Defective Nature of PSAN Airbag Propellants Until 2014 is Unsupported and Unreliable.

Sims first moves to exclude Lange's opinion relating to BMW's lack of knowledge about the defective nature of PSAN airbag propellants until 2014 as unreliable because Lange lacks relevant experience, he failed to educate himself on the pertinent documents and issues, and he failed to consider and account for information (including his own industry experience) that directly contradicts his opinion. As a result, Lange's opinion is purely subjective, unsupported *ipse dixit* that must be excluded.

*Daubert* and the Federal Rules of Evidence certainly contemplate that some expert witnesses may be qualified based on experience in a pertinent field. *United States v. Frazier*, 387 F.3d 1244, 1260–61 (11th Cir. 2004) (en banc). "Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable

*any* conceivable opinion the expert may express." *Id.* at 1261. When an expert like Lange relies on experience to express an opinion, he must explain why his experience is a sufficient basis for the opinion and how that experience is reliably applied to the facts of the case. *Id.* at 1272; *Augustin*, 661 F.3d at 1125. In that sense, an expert like Lange who relies on experience to offer opinion testimony must use sufficient facts and information to support those opinions, and not rely solely on subjective interpretations that do not fit the case. *Grayson v. No Labels, Inc.*, 599 F. Supp. 3d 1184, 1191 (M.D. Fla. 2022). To be sure, "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). District courts should exclude expert testimony where, as here, "there is simply too great an analytical gap between the data and the opinion offered." *Id.*

While Lange may be experienced in many areas of the automotive industry, he lacks prerequisite experience in the areas that matter in this case. Lange states he has no qualifications, education, or experience with airbag propellants or their design, development, or chemistry. (Doc. 195, 40:3–40:13, 51:20–22). Lange has never worked for BMW NA, BMW AG, or any BMW-related entity. (*Id.* at 20:8–18). Nor has Lange ever worked for a designer, manufacturer, or supplier of an automotive component that was intended to be used in a BMW vehicle, including

airbags. (*Id.* at 20:19–23). Lange does not remember working or collaborating with BMW on any projects while he was employed by Ford. (*Id.* at 20:24–21:1). At GM, Lange recalls being tangentially involved in research projects where BMW's engineers were also involved, but those projects related to rulemaking and standardization across the industry and not to airbags or propellants directly. (*Id.* at 21:2–24:6).

As a consequence of his lack of relevant experience, Lange knows little about the relationship between BMW and the supplier of the defective airbag inflator at issue in this case, Takata. Lange states he does not know how BMW came to have a relationship with Takata and he does not know when that relationship started. (*Id.* at 39:1–18). While he understands there would have been direct communications between BMW and Takata, Lange does not know what those communications were and he does not know the history or morphology of the companies' relationship together. (*Id.*). Lange does not know what level of supplier (Tier 1 or Tier 2) Takata was to BMW with respect to the inflator at issue in this case. (*Id.* at 37:23–38:25). According to his file directory, Lange has not reviewed any documents or communications relating to the design, manufacture, performance, or testing of the model of Takata airbag inflator BMW used in the subject BMW vehicle. (*See* Ex. E; Doc. 195, 42:1–22 (describing what he reviewed); Doc. 195, 46:18–22 ("Q. Is there anything else, outside of this directory that we're

marking as Exhibit 2 to your deposition, that you considered in forming your opinions in this case? A. No, sir.")).

Notwithstanding his lack of experience with airbag propellants, the chemistry, performance, and known dangers of PSAN, and BMW's interactions and dealings with Takata during the relevant time period, Lange did nothing to educate himself or become sufficiently informed to render the opinion he wants to give. Lange did not consult with anyone from BMW NA or BMW AG in connection with his analysis of this case. (Doc. 195, 42:23–43:2). He did not consult with anyone from Takata or any Takata-related entity either. (*Id.* at 43:3–6). And he did not consult with anyone in the airbag propellant industry. (*Id.* at 43:7–11). Lange did not review any documents or records contained in the Takata Multidistrict Litigation document repository and does not know what kinds of relevant documents and information are contained there. (*Id.* at 47:3–21). Lange has not reviewed any engineering, design, manufacturing, development, or testing records relating to the defective airbag inflator at issue in this case, and he does not know what these records show. (*Id.* at 57:1–10; *see also* Ex. E). Lange has not reviewed and is generally unfamiliar with the voluminous literature, patents, and research studies (including those cited in Renz' report) speaking to the dangers of ammonium nitrate and the propensity of PSAN-based propellants to cause ruptures during airbag deployment. (*See* Doc. 195, 65:12–66:1; Ex. E).

Combined, Lange's lack of relevant experience and his failure to educate himself and review critical materials in forming his opinions steer him to erroneously believe that BMW could not have known about the defective and dangerous nature of PSAN-based propellants because, as he says, "[t]he science was not settled until 2015 – 2016." (Ex. A, p. 30). But contrary to Lange's mistaken belief, and as Renz meticulously details in his report, the science was in fact settled several decades ago, and BMW's own engineering documents and communications with Takata show BMW's long-standing knowledge of that science. Renz—an airbag propellant engineer who worked directly with BMW over his career and who actually reviewed engineering records and BMW/Takata communications relating to the inflator at issue in this lawsuit—confirms that BMW was acutely aware of the defects and risks inherent in using PSAN as an airbag propellant, as demonstrated through the engineering records for the inflator that were approved by BMW. (Ex. B, pp. 16, 18–19). Renz also states BMW had direct communications with Takata about these issues over the course of BMW's sourcing and development of the inflators for its vehicles and approved the defective inflators anyways. (*Id.*). Lange's lack of relevant experience and his failure to review these engineering records and BMW/Takata communications (even after having Renz' report in hand) means that Lange did not base his opinion

on sufficient information and failed to consider critical, primary source data that directly contradicts the opinion he was paid to reach.

Perhaps more astonishing than Lange's lack of relevant experience and his failure to sufficiently inform himself about the critical subject areas of the case that he admittedly knows little about, the experience Lange *does* have in the automotive industry runs contrary to his opinion that BMW could not have known about the PSAN defect. At his deposition, Lange testified extensively about his experiences with component suppliers when he worked for a combined 27 years at Ford and GM. Based on his experience, Lange says vehicle manufacturers like BMW are intimately involved in working with component suppliers like Takata to engineer, develop, and test the component parts that go into their vehicles, with the vehicle manufacturer and component supplier exchanging engineering records, drawings, and communications throughout the process. (Doc. 195, 24:10–36:24). This includes vehicle manufacturers and component suppliers discussing and exchanging engineering records called Failure Mode and Effects Analyses ("FMEAs"), which disclose the various risks of failure associated with the component and the possible effects on consumer safety. (*Id.* at 52:8–56:12). Lange testified he is aware that FMEAs covering the airbag inflator at issue in this case were exchanged between BMW and Takata; he just has not seen these documents and does not know what they show. (*Id.* at 57:1–58:11). Renz—who did review the

FMEA documents—confirms that they show BMW knew about the PSAN defect and risk of rupture present in the inflators when BMW sourced the inflators from Takata. (Ex. B, p. 16). In any event, Lange unequivocally agrees that vehicle manufacturers like BMW are ultimately responsible for the safety and quality of the components they install in their vehicles. (Doc. 195, 59:22–60:2). Nevertheless, and in an inexplicable disregard of this admission and his own 27-years' worth of experience working at Ford and GM, Lange opines BMW had no knowledge about the defective and dangerous condition of the PSAN-based airbag inflators it was installing into its vehicles.

Lange has no relevant experience that would allow him to conclude BMW did not know about the defective airbag propellant at issue in this case. Despite his lack of relevant experience, Lange did not attempt to sufficiently inform himself about the propellant or BMW's relationship with Takata, and he did not consider crucial engineering records, industry literature, and communications between BMW and Takata. Moreover, the experience Lange does have in the automotive industry directly contradicts the opinion he gives. And Lange offers no explanation whatsoever in either his report or deposition testimony why he disregards his contradictory experience, why he did not consider the necessary engineering documents and BMW/Takata records, or why the experience he does have is a sufficient basis for arriving at a conclusion that is the opposite of what

these materials show. In sum, Lange's opinion comprises nothing more than his unsupported, subjective say-so, and "there is simply too great an analytical gap between the data and the opinion [Lange] offer[s]." *Joiner*, 522 U.S. at 146.

Courts regularly exclude the type of unsupported *ipse dixit* testimony Lange tries to offer here, and the Court's recent analysis in *Grayson v. No Labels, Inc.*, 599 F. Supp. 3d 1184 (M.D. Fla. 2022), is instructive. There, the Court was confronted with an expert witness in a defamation case who offered an opinion that the publisher of the allegedly defamatory statements at issue acted with reckless disregard for their truth—that is, the publisher knew or should have known about the statements' untrue nature. *Id.* at 1191. While the expert cited certain materials in his report and a vague reference to "mainstream reporting standards," the expert never explained his methodology or how the materials he cited led him to the conclusion he reached about the publisher's knowledge. *Id.* at 1191 & n.5. The Court consequently excluded the opinion as unreliable *ipse dixit* that was not supported by a methodology. *Id.*

See also, e.g., *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1112 (11th Cir. 2005) (holding expert opinion unreliable because the opinion lacked an articulated methodology); *LLB Convenience & Gas, Inc. v. Se. Petro Distribs.*, Inc., 476 F. Supp. 3d 1225, 1237 (M.D. Fla. 2020) (excluding expert opinion as unreliable where the expert did not consider sufficient facts and the

opinion was contrary to the expert's own industry experience); *Yellowpages Photos, Inc. v. YP, LLC*, No. 8:17-cv-764-T-36JSS, 2019 WL 6033084, at *7 (M.D. Fla. Nov. 14, 2019) (excluding expert opinion as unreliable where the expert did not sufficiently inform himself about the case and did not explain how he formed his opinion).

Like the experts excluded in *Grayson*, *Cook*, *LLB Convenience & Gas*, and *Yellowpages Photos*, Lange offers no reliable methodology to support his conclusion that BMW did not know about the defect at issue in this case. Lange has no relevant experience that would allow him to reach such a conclusion, and he did not sufficiently educate himself or review the relevant documents that would have counseled him on the subject. Moreover, Lange's own industry experience contradicts the opinion he offers, and he fails to explain why he disregarded the contradictory experience he does have that should have led him to the opposition conclusion. Because Lange's opinion is nothing more than ip*se dixit* that is untethered to a reliable methodology, his opinion that BMW did not know about the defective nature of its airbags must be excluded.

C.  **To the Extent Lange Opines that He is "Unaware of Any Evidence" Indicating BMW's Knowledge of the PSAN Defect, Lange's Opinion is Unhelpful and Irrelevant.**

In his report, Lange opines in part that he is "unaware of any evidence" showing BMW's knowledge of the defect at issue in this case. (Ex. A, p. 30). While

this opinion is unreliable for the reasons discussed above, it is also irrelevant and will not assist the jury in any meaningful way.

Expert testimony assists the jury when it is relevant to an issue in the case and will help the jury understand the evidence or decide a disputed fact. *Daubert*, 509 U.S. at 595; *Kumho Tire*, 526 U.S. at 148–49. Lange's opinion that he is "unaware of any evidence" speaking to BMW's knowledge of the defect does not accomplish these tasks. The reason Lange is "unaware of any evidence" is because he has no relevant experience, he did not sufficiently inform himself on the subject matter, and he did not review the evidence that would have made him aware. In short, Lange wants to shrug his shoulders and tell the jury about what he does not know. Such testimony is irrelevant, is not helpful to understanding the evidence or deciding any issue in the case, and serves no useful purpose at trial.

**D.    Lange's Opinion that Takata Provided False Information to BMW About Airbag Inflators or Attempted to Deceive BMW is Unsupported and Unreliable.**

Sims moves to exclude Lange's opinion that Takata provided false information and attempted to deceive BMW about the defective nature of its PSAN airbag inflators because Lange has no evidence or foundation to make the opinion and he admits he has no idea whether the opinion is true. As a result, Lange's opinion is again nothing more than subjective, unsupported *ipse dixit* that must be excluded.

The origin of Lange's opinion is itself suspect. Lange makes a statement in his report that Takata provided false information about its airbag inflators to other vehicle manufacturers, failed to correct the information, and continued in its false dealings with these manufacturers into 2015. (Ex. A, pp. 21–22). Lange did not offer any opinions in his report relative to this statement and did not try to connect Takata's misrepresentations to and interactions with other vehicle manufacturers to BMW specifically. (*See id.* at pp. 29–30). Lange cites to a separate report (referred to as the "Dechert Report") and to a plea agreement between Takata and the U.S. Department of Justice as the basis for making the statement. (*Id.* at p. 22, nn. 105, 106). When asked at deposition whether he knew whether Takata provided any false information to BMW specifically, Lange unequivocally stated he did not, effectively disavowing himself of any such opinion:

> Q.  Do you know of any evidence suggesting that Takata falsified data with respect to BMW's Takata airbag modules?
>
> A.  I don't know.

(Doc. 195, 59:6–9).

During cross-examination, however, BMW's counsel attempted to bate Lange into opining that Takata did in fact provide false information about its PSAN airbag inflators to BMW, notwithstanding Lange's firm testimony that he did not know whether this was true. For example, BMW's counsel asked Lange to

agree that the Dechert Report and the Takata plea agreement proved Takata's false dealings with BMW specifically, despite BMW not being mentioned in either document. (*Id.* at 70:3–23, 71:5–22). BMW's counsel also urged Lange to agree that a former Takata employee, Robert Schubert, testified in another proceeding that Takata provided false information to BMW. (*Id.* at 70:24–71:4). Finally, when confronted with the reality that Lange truly has no knowledge on the subject, BMW's counsel asked Lange if it is "possible" that Takata falsified information provided to BMW, to which Lange (despite not knowing) agreed to the possibility. (*Id.* at 74:12–23).

Fortunately, Lange acquiesced to the truth and subsequently confirmed his original testimony that he knows of no evidence suggesting that Takata provided false information to BMW about BMW's airbag inflators:

> Q. As you sit here today, are you able to identify any document or record that was falsified by Takata and given to BMW with respect to inflators?
>
> A. I—I don't—no. I cannot.

(*Id.* at. 74:3–6).

> Q. Mr. Lange, can you say one way or the other whether you know of documents or information that Takata falsified and gave to BMW?
>
> A. I cannot.

(*Id.* at 75:7–10).

Lange's testimony that Takata supplied false information to BMW about its PSAN airbag inflators is unreliable, speculative, and unsupported by any of the evidence he considered. As Lange correctly observed during his deposition, the Dechert Report and Takata plea agreement he cites do not mention BMW at all. (*Id.* at 70:3–23; *see also* Exs. F, G). In fact, Lange admitted he understood that these documents were actually referring to Takata's deception of another vehicle manufacturer, ***Honda***, and that he was unable to discern whether the same deception happened to BMW. (Doc. 195, 73:10–74:1). With respect to the prior testimony of former Takata employee, Robert Schubert, it is entirely unclear how Schubert's testimony could possibly support Lange's opinion, as Lange provides no information about what Schubert's testimony was, what (if anything) Schubert claimed Takata falsified to BMW, or whether the false information (if any) related to BMW's airbag inflators.[3] (*See* Ex. A, p. 18; Doc. 195, 70:24–71:4). To the extent Lange acknowledged the possibility that Takata ***might*** have provided false information to BMW, the existence of possibility alone is purely speculative, lacks any foundation under *Daubert*, and cannot serve as a basis for forming an expert opinion. Regardless, Lange provides no further basis for the opinion and

---

[3] Note that Lange's testimony is a vague reference that "some of the materials provided to BMW were not correct," without referencing what the materials are, when they were provided to BMW, or how they were "not correct." (Doc. 195, 71:2–4). In any event, Lange confirmed multiple times that he knows of no evidence suggesting that Takata provided false information to BMW **relating to BMW's airbag inflators**, which is the relevant topic in this case. (*Id.* at 59:6–9, 74:3–6, 75:7–10).

confirmed multiples times on the record that he has no idea whether Takata provided false documents or information about airbag inflators to BMW. (Doc. 195, 59:6–9, 74:3–6, 75:7–10).

Lange's repeated admissions that he does not know coupled with his lack of any objective evidence, knowledge, experience, or any other basis to reliably form the opinion makes his testimony on the topic unsupported and unreliable. Accordingly, Lange cannot be permitted to testify that Takata provided false documents or information to BMW relating to BMW's airbag inflators.

> ### E. To the Extent Lange Opines that Takata Provided False Information to and Attempted to Deceive Other Vehicle Manufacturers, Lange's Opinion is Unhelpful and Irrelevant.

In his report, Lange offers the statement that Takata provided false information about its airbag inflators to other vehicle manufacturers, failed to correct the information, and continued in its false dealings with these manufacturers into 2015. (Ex. A, pp. 21–22). This statement must be excluded as unhelpful, irrelevant, and as otherwise inadmissible under Rule 403.

Again, expert testimony assists the jury when it is relevant to an issue in the case and will help the jury understand the evidence or decide a disputed fact. *Daubert*, 509 U.S. at 595; *Kumho Tire*, 526 U.S. at 148–49. The Court may also exclude expert testimony under *Daubert* and Rule 403 where its probative value is

substantially outweighed by the dangers of unfair prejudice, confusing the issues, and misleading the jury. *Daubert*, 509 U.S. at 595.

Lange's opinion that Takata provided false information to or attempted to deceive other vehicle manufacturers relative to their airbag inflators is plainly irrelevant under Rule 401 and will not help the jury. The only vehicle manufacturer at issue here is BMW, which is responsible for designing, manufacturing, and distributing the subject BMW vehicle that caused Sims' injuries. Accordingly, BMW is the only vehicle manufacturer whose interactions with Takata and knowledge of the PSAN defect matter in this case. Whether other non-party vehicle manufacturers received false information from or were deceived by Takata has no probative value and does not make it any more or less probable that BMW in particular had (or did not have) knowledge of the defect. Consequently, Lange's opinion about other vehicle manufacturers will not help the jury understand or decide any evidence or issue in this case.

Moreover, introducing evidence relating to other vehicle manufacturers receiving false information from or being deceived by Takata will only serve to confuse the issues, mislead the jury, waste time at trial, and unfairly prejudice Sims. Sims is only suing BMW for the defective vehicle BMW made and BMW's concomitant knowledge of that defect; Sims is not suing any other vehicle manufacturer about the defective condition of any other vehicle. Allowing Lange

to testify about other vehicle manufacturers, their vehicles, their interactions with Takata, or their knowledge of the PSAN defect is not only irrelevant, but also inadmissible in light of Rule 403's considerations.

## IV.    CONCLUSION & REQUEST FOR RELIEF

For the aforementioned reasons, Lange's opinions that BMW could not have known about the PSAN defect and that Takata provided false information and attempted to deceive BMW and/or other vehicle manufacturers should be excluded as unreliable, unhelpful, irrelevant, and otherwise inadmissible.

**WHEREFORE**, Plaintiff, William Harrison Sims, respectfully requests that the Court enter an Order granting the instant motion, excluding the opinions and testimony of Robert C. Lange that are challenged by this motion, and directing such further relief as this Court deems appropriate.

### LOCAL RULE 3.01(g) CERTIFICATION OF CONFERENCE

Pursuant to Local Rule 3.01(g), the undersigned counsel certifies that he conferred with Defendants' counsel by telephone and email prior to filing the instant motion in a good faith effort to resolve the dispute raised herein, but the parties were unable to reach an agreement.

Dated: August 5, 2024                Respectfully submitted,


                                     /s/ *Steven E. Nauman*
                                     **STEVEN E. NAUMAN, ESQ.**
                                     Florida Bar No.: 106126

**Morgan & Morgan, P.A.**
20 North Orange Avenue, Suite 1600
Orlando, FL 32801
Telephone: (407) 244-3962
Email: snauman@forthepeople.com
Secondary Email:
angelinarodriguez@forthepeople.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that, on August 5, 2024, the foregoing document was electronically filed with the Clerk of Court for the Middle District of Florida, Orlando Division, by using the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Steven E. Nauman*
**STEVEN E. NAUMAN, ESQ.**
Florida Bar No.: 106126
**Morgan & Morgan, P.A.**
20 North Orange Avenue, Suite 1600
Orlando, FL 32801
Telephone: (407) 244-3962
Email: snauman@forthepeople.com
Secondary Email:
angelinarodriguez@forthepeople.com
*Counsel for Plaintiff*