UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**WILLIAM HARRISON SIMS,**

    **Plaintiff,**

v.               Case No: 6:22-cv-1685-PGB-UAM

**BMW OF NORTH AMERICA
LLC and BAYERISCHE
MOTOREN WERKE AG,**

    **Defendants.**
_____/

## ORDER

This cause is before the Court on Plaintiff's Motion to Exclude Certain Opinions and Testimony of Robert C. Lange ("**Mr. Lange**"). (Doc. 202 (the "**Motion**")). Defendants BMW of North America LLC ("**BMW NA**") and Bayerische Motoren Werke AG ("**BMW AG**") (collectively, "**BMW**" or "**Defendants**") filed a Response in Opposition. (Doc. 231). Upon consideration, the Motion is denied.

**I. BACKGROUND**

The procedural setting and the standard of review under *Daubert* are outlined in the Court's Order denying Defendants' Motion to Exclude Certain Testimony of Perry Ponder, P.E. (Doc. 249) and are incorporated here.

## II. SUMMARY OF ISSUES

Plaintiff contends that BMW knew that the subject vehicle was defective because the airbag inflator used phase-stabilized ammonium nitrate ("**PSAN**") as the airbag's propellant, causing the inflator to rupture when the airbag deployed during the accident. (Doc. 202, p. 2). Plaintiff's engineering expert, Mr. Robert Renz, Jr. ("**Mr. Renz**"), will testify that PSAN is susceptible to temperature fluctuations and absorbs moisture and degrades over time, resulting in over-pressurization. (*Id.* at p. 3). Mr. Renz is expected to testify that PSAN's dangerous propensities have been well-known in the automotive industry for several decades. (*Id.* (citing Doc. 202-2, ¶¶ 24–25, 27, 35–66)). Mr. Renz states in his report that BMW, via its management, "knew about the defective nature of PSAN before it built the Plaintiff's BMW vehicle." (Doc. 202-2, ¶ 65). Mr. Renz bases this opinion on design and development documents approved by BMW, BMW's internal communications, and corporate testimony. (*Id.* ¶¶ 65–66; *see id.* at pp. 25–26).

Plaintiff submits that Mr. Lange, BMW's mechanical engineer, is prepared to opine that he is unaware of any evidence showing the Defendants "could have been aware air bag systems supplied by Takata to BMW AG were defectively designed prior to Takata's announcement of defect findings beginning in 2014." (Doc. 202, p. 8 (quoting Doc. 202-1, ¶ 75)). Mr. Lange will also opine that when the subject 2004 BMW was distributed by BMW NA, "no motor vehicle manufacturer or distributor could have known of the technical research findings regarding the latent defect in Takata air bag inflators [because] [t]he science was not settled until

2

2015–2016." (*Id.* (quoting Doc. 202-1, ¶ 76)). Mr. Lange also contends that Takata falsified data provided to vehicle manufacturers through 2015 and failed to correct the false data once the defect was discovered. (*Id.* at p. 9 (citing Doc. 195, 59:6–9, 70:2–71:22, 74:3–75:1)). Plaintiff argues Mr. Lange's opinions are unsupported and unreliable. (*Id.* at p. 10).

### III.   DISCUSSION

The issue is whether Mr. Lange's opinions are based on sufficiently reliable methods and principles. If they are, then Mr. Lange's opinions are undoubtedly helpful to the jury. If his opinions are unsupported *ipse dixit*, they must be excluded. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The Court should exclude an expert's testimony when "there is simply too great an analytical gap between the data and the opinion offered." *Id.* When an expert relies primarily on experience in forming his opinions, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Augustin*, 661 F.3d 1105, 1125 (11th Cir. 2011) (quoting *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (en banc)). That said, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)).

### A.     Mr. Lange's Methodology and Opinions

In his expert report, Mr. Lange discusses his investigation into the Takata air bag failures. He notes that Honda conducted the first recall of Takata air bag systems for inflator failure in a letter dated November 11, 2008. (Doc. 202-1, ¶ 43). Mr. Lange states that Dr. Harold Blomquist was hired by NHTSA to assist in its Takata defect investigation and issued his report in 2015. (*Id.* ¶ 46). According to Mr. Lange, Dr. Blomquist's report "appears to be the first technical analysis of root cause that was published and to which OEMs would have had access." (*Id.*). Dr. Blomquist agrees with Mr. Renz as to the root cause of the inflator failure. (*Id.* ¶ 46(f)(i)–(iii)). Mr. Lange found that "Takata's development work [on the inflator] did not adequately consider or address the chemical and physical stability of the propellant in service conditions." (*Id.* ¶ 47(a)).

Mr. Lange's report outlines the timeline prepared by NHTSA, beginning with the first inflator rupture, which occurred in February 2007 in Arizona and involved a 2001 model-year Honda Civic (*Id.* ¶ 49). He also discusses a joint investigation by Takata and Honda undertaken in 2007 and 2008, resulting in a "fault tree analysis," which outlines a methodology to identify the cause of inflator failures. (*Id.* ¶ 50(a)–(b)). Four inflator ruptures occurred in 2007 and 2008, or before the subject vehicle was manufactured. (*Id.*; *see also id.* at p. 22 nn.109–110). Mr. Lange is critical of Takata's failure to identify environmental exposure conditions as the root cause sooner. (*Id.* ¶ 50(b)). Next, Mr. Lange considered Honda's Part 573 defect letter, in which Honda identified a VIN range based on a

4

perceived manufacturing defect. (*Id.* ¶¶ 51(a)–(b), 52). As Honda continued to receive reports of inflator ruptures in 2009, falling outside the VIN range, Honda developed a new hypothesis regarding the propellant. (*Id.* ¶ 53). The expanded incidents of inflator ruptures led to NHTSA opening a Recall Query. (*Id.* ¶ 55).

Documents from the Recall Query revealed that Takata represented to Honda that the ruptures were caused by a "Stokes press" that forms propellant into a wafer, causing the propellant to burn too quickly and rupture the inflator. (*Id.* ¶ 55(a)). Accordingly, in 2010, Honda expanded the recall to include the new basis. (*Id.* ¶ 55(c)). Between 2010 and 2013, Honda and Takata continued to receive reports of inflator ruptures, and Takata retained consultants to conduct a root cause analysis. (*Id.* ¶ 56). The investigation focused on manufacturing errors, which Mr. Lange opines caused Takata to undervalue post-manufacture moisture as the culprit. (*Id.*). In April of 2013, Mr. Lange reports that Takata issued a safety defect report, including passenger side air bag inflators and identified BMW AG as having been supplied the defective inflators. (*Id.* ¶ 57). BMW and the other affected vehicle manufacturers thereafter issued safety defect notices. (*Id.*).

Takata's root cause analysis continued, and in 2014, research pointed to moisture and temperature in high absolute humidity regions as causing an increased propellant burn rate. (*Id.* ¶ 58). On May 18, 2015, Takata, with NHTSA's involvement, issued four Defect Information Reports confirming the defect was not limited to a VIN range and had nationwide implications. (*Id.* ¶ 59). A Consent Order dated November 3, 2015, confirmed that Takata failed to provide timely

notice to NHTSA of one or more safety-related defects, produced testing reports that contained selective, incomplete, or inaccurate data, failed to clarify inaccurate information provided to NHTSA, and failed to comply with NHTSA's Special Orders from October 30 and November 18, 2014. (*Id.* ¶ 61(a)–(d)). On December 17, 2015, BMW issued Part 573 Recall Report 15V-318 covering over 400,000 BMW vehicles. (*Id.* ¶ 62). The following year, Exponent, Inc. (Mr. Lange's firm) published a summary of its research into Takata PSAN-based air bag inflator ruptures, and Orbital ATK published its research the same year. (*Id.* ¶¶ 63–64).

Mr. Lange notes that Takata applied "USCAR requirements and/or OEM specific requirements to evaluate inflator performance."[1] (*Id.* ¶ 47). He concludes that "[d]uring the inflator development phases, Takata falsified data provided to vehicle manufacturers. When the false data was discovered, Takata failed to correct the false data by informing the manufacturer and correcting the record." (*Id.* ¶ 47(b) (citing Takata Report, p. 21)). Mr. Lange also notes that "Takata's false dealings with vehicle manufacturers evidently extended into 2015." (*Id.* (citing 202-7, pp. 48–49)).[2]

---

[1] Mr. Lange cites to the "Takata Report" in footnote 102 of his report. (Doc. 202-1, p. 21 n.102). The full title of the referenced Takata Report is "Report of TK Holdings Inc. Pursuant to Paragraph 33.a of the November 3, 2015 Consent Order" by Dechert LLP. It is unclear to the reader who actually authored this report, but Plaintiff does not challenge its accuracy or methodology.

[2] Mr. Lange does not quote the Plea Agreement to support his opinion that Takata's deception continued into 2015. He also does not identify which vehicle manufacturers were allegedly deceived.

Mr. Lange opines that BMW AG was the designer and manufacturer of the subject vehicle but was not responsible for vehicle-level specifications and requirements for the driver front air bag system performance, function, and fit, including the air bag inflator. (*Id.* ¶ 67). He opines that Takata was responsible for designing and engineering the air bag inflator to meet BMW AG's requirements, including "safe inflator ignition characteristics within the target life of the vehicle." (*Id.* ¶ 68). Ultimately, Mr. Lange opines that BMW AG and BMW NA would not have been aware the air bag systems supplied by Takata were defectively designed until early 2014, ten years after the subject vehicle was manufactured. (*Id.* ¶¶ 75–76).

### B. Plaintiff's Objections

Plaintiff challenges the admissibility of the following opinions offered by Mr. Lange:

> 75. I am unaware of any evidence showing BMW AG and BMW NA could have been aware air bag systems supplied by Takata to BMW AG were defectively designed prior to Takata's announcement of defect findings beginning in 2014.
>
> 76. As of the date of distribution of the Subject 2004 BMW 330Ci, by BMW NA, no motor vehicle manufacturer or distributor could have known of the technical research findings regarding the latent defect in Takata air bag inflators. The science was not settled until 2015–2016.

(Doc. 202, p. 8).

Plaintiff also challenges the following statement made by Mr. Lange:

> During the inflator development phases, Takata falsified data provided to vehicle manufacturers. When the false data was discovered, Takata failed to correct the false data by informing

7

> the manufacturer and correcting the record. Takata's false dealings with vehicle manufacturers evidently extended into 2015.

(*Id.* at pp. 8–9).

Mr. Lange's statement regarding Takata's alleged deception derives from the Report of TK Holdings Inc. Pursuant to Paragraph 33.a of the November 3, 2015 Consent Order by Dechert LLP. As to this statement, Plaintiff notes Mr. Lange conceded at deposition that while the evidence shows Takata may have falsified information about the defective inflators supplied to other vehicle manufacturers, he does not possess evidence that Takata lied to BMW. (Doc. 202, pp. 9–10 (citing Doc. 195, 59:6–9; 74:3–6; 75:7–10)). Plaintiff contends that Mr. Lange will confuse the jury if permitted to offer evidence that Takata lied to other vehicle manufacturers without having proof Takata lied to BMW. (*Id.* at p. 24).

Plaintiff next argues that Mr. Lange "knows little about the relationship between BMW and the supplier of the defective airbag inflator at issue in this case, Takata." (*Id.* at p. 12). Plaintiff contends Mr. Lange has never worked for BMW and knows little about the relationship between BMW and Takata. (*Id.*). While Mr. Lange understands that BMW and Takata would have communicated, he is unfamiliar with the communications and "has not reviewed any documents or communications relating to the design, manufacture, performance, or testing of the model of Takata airbag inflator BMW used in the subject BMW vehicle." (*Id.* (citing Doc. 195, 42:1–22)). Plaintiff also avers Mr. Lange failed to review "the voluminous literature, patents, and research studies . . . speaking to the dangers of

ammonium nitrate and the propensity of PSAN-based propellants to cause ruptures during airbag deployment." (*Id.* at p. 13 (quoting Doc. 195, 65:12–66:1)). For example, Plaintiff notes that BMW and Takata exchanged engineering records called Failure Mode and Effects Analyses ("**FMEA**") which address risks of failure associated with a component, but Lange did not review these documents. (*Id.* at p. 15).

Plaintiff contrasts Mr. Lange's bases of knowledge with the documents reviewed by Mr. Renz, Plaintiff's expert, and contends the FMEA document shows BMW knew about the PSAN defect and risk of inflator rupture when BMW sourced the inflators from Takata. (*Id.* at p. 16). Plaintiff submits that Mr. Lange lacks relevant experience and did not consider crucial engineering records, literature, and communications between BMW and Takata to support his opinions regarding BMW lacking knowledge that the Takata-sourced inflators were defectively designed prior to 2014. (*Id.* at pp. 16–17). Plaintiff also argues that Mr. Lange's opinion that he is "unaware of any evidence" showing BMW's knowledge of the defect is not helpful to the jury. (*Id.* at p. 19). Plaintiff asserts Mr. Lange failed to inform himself on the subject matter sufficiently, and his lack of evidence that BMW was aware of the risks attendant to using PSAN does not equate with BMW's lack of knowledge. (*Id.*).

### C.   Ruling

Mr. Lange has extensive experience working at Ford Motor Company, Failure Analysis Associates, and the General Motors Corporation. (Doc. 202-1, ¶¶

9

2–3). Mr. Lange has experience in statistical analysis of motor vehicle service performance databases, statistical forecasting and reliability analysis, FMEA and failure mode avoidance methods, collision-related data acquisition and analysis, safety rulemaking, strategy, and the like. (*Id.* ¶ 4). During his work with Ford, Mr. Lange was responsible for vehicle design and remedying safety defects serviced as recall actions. (*Id.* ¶ 5). As the Safety Executive with General Motors, Mr. Lange oversaw research projects involving air bags, occupant restraint systems, driver assist technology, and other vehicle systems. (*Id.* ¶ 8). He also supervised the "Product Investigations" Department and was responsible for identifying potential safety defects and initiating investigations. (*Id.* ¶¶ 10–14). Mr. Lange possesses the requisite experience to review the data, investigative reports, and shifting root-cause analysis discussed in his report.

On balance, the Court does not find that Mr. Lange's opinions rest on mere *ipse dixit* and instead are based on his review of relevant documents showing Takata's shifting root cause analysis. Takata initially focused on a manufacturing defect before conceding that the defect had broader implications, which was consistent with Takata hiding the ball from BMW. Basing one's opinions on the Honda recall and subsequent NHTSA investigations to conclude that the science was not settled until the mid-2000s is a sufficiently reliable methodology. Mr. Lange's opinion that BMW NA was not responsible for the defective design of the subject inflator and that BMW was not on notice until around 2015 is supported by these evolving investigations. As such, Mr. Lange's opinions rest on a

10

sufficiently reliable methodology. Furthermore, his testimony is relevant and helpful to the jury.

Plaintiff may, of course, cross-examine Mr. Lange to demonstrate any flaw in his analysis, and the jury ultimately may find BMW knew using PSAN as a propellant was a ticking timebomb. That determination is for the jury's purview and not the Court's.

## IV. CONCLUSION

Plaintiff's Motion to Exclude Certain Opinions and Testimony of Robert C. Lange (Doc. 202) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on February 20, 2025.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

11