UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**WILLIAM HARRISON SIMS,**

      **Plaintiff,**

v.                                                 Case No: 6:22-cv-1685-PGB-UAM

**BMW OF NORTH AMERICA
LLC and BAYERISCHE
MOTOREN WERKE AG,**

      **Defendants.**
_____/

**ORDER**

This cause is before the Court on Defendants BMW of North America LLC and Bayerische Motoren Werke AG's ("**BMW AG**") (collectively, "**BMW**," "**the BMW Defendants**," or "**Defendants**") Motion to Exclude the Testimony of Robert Renz, Jr. ("**Mr. Renz**"). (Doc. 210 (the "**Motion**")). Plaintiff filed a Response in Opposition. (Doc. 232). Upon consideration, the Motion is denied.

**I. BACKGROUND**

The procedural setting and the standard of review under *Daubert* are outlined in the Court's Order denying Defendants' Motion to Exclude Certain Testimony of Perry Ponder, P.E. (Doc. 249) and are incorporated here.

**II. DISCUSSION**

Defendants challenge the admissibility of Plaintiff's airbag inflator expert Robert Renz, Jr.'s opinion that "BMW knew about the 'defective nature of PSAN'

at the time of manufacture but did not disclose it until May 2015." (Doc. 210, p. 2). Defendants acknowledge that "[t]he issue in this case is whether the BMW Defendants had knowledge of the defect and failed to remedy it timely."[1] (*Id.*). Defendants further contend that the other opinions offered by Mr. Renz "concern issues largely not in dispute in this case." (*Id.*). As such, Defendants submit that Mr. Renz's first three opinions are irrelevant and unhelpful to the jury. (*Id.* at p. 12). The Court will address Mr. Renz's first three opinions before turning to the fourth, on which Defendants raise substantive arguments.

### A. Mr. Renz's First Three Opinions

Defendants assert there is no dispute that "(1) the use of PSAN renders the inflator defective and unreasonably dangerous; (2) the 2004 BMW 330Ci ("**Subject BMW**" [or "**Subject Vehicle**"]) operated by Plaintiff contained an inflator with PSAN; [and] (3) the defect was present in the inflator at the time the Subject BMW was manufactured and sold." (*Id.* at p. 2). Mr. Renz's first three opinions appear in the conclusion of his expert report, as follows:

> 67. In my expert opinion, the use of PSAN in an all-pyrotechnic automotive application, such as the Relevant Inflator, renders the component defective and unreasonably dangerous. When combined [sic] the lack of hermetic seals, rupture of the Relevant Inflator is inevitable. The root cause of the failures in the Relevant Inflator is the use of PSAN.
>
> 68. In my expert opinion, all of the PSDI-4 PSAN inflators equipped in the BMW's vehicles, including the BMW Subject

---

[1] Defendants also argue that some of the sources referenced by Mr. Renz in his expert report were not provided to the BMW Defendants before or at the time of his June 27, 2024 deposition. (Doc. 210, p. 4). However, the Court rejected this argument in its Order denying Defendants' Motion for Sanctions. (*See* Doc. 251).

2

>Vehicle, are defective and share a common and uniform defect.
>
>69. In my expert opinion, this defect was present in the Relevant Inflator installed in Plaintiff's [S]ubject BMW vehicle at the time the vehicle was manufactured and sold. In my expert opinion, this defect caused the Relevant Inflator to rupture during the airbag deployment in the Plaintiff's [Subject] BMW vehicle occurring October 24, 2019.

(Doc. 232-1, ¶¶ 67–69).

Defendants concede that "the inflator here ruptured and contained PSAN." (Doc. 210, p. 12). They also admit that the defect was present in the Relevant Inflator installed in Plaintiff's subject BMW at the time the vehicle was manufactured and sold. (*Id.* at p. 14). Therefore, they claim Mr. Renz's "opinion is irrelevant . . . as it concerns facts not in dispute." (*Id.*). To put a finer point on it, the "BMW Defendants dispute the cause of Plaintiff's injuries (i.e., that any airbag deployment could have caused the same injuries), not the underlying facts that Plaintiff's airbag inflator did rupture and the reasons why."[2] (*Id.*).

Defense counsel's concession that the inflator in the Subject Vehicle was defective when the Subject Vehicle was manufactured and sold and caused the inflator to rupture is admissible under Federal Rule of Evidence 801(b)(2)(C) and (D), as an opposing party's statement made by Defendants' agent or authorized

---

[2] As discussed in the Court's Order on Defendants' Motion to Exclude Certain Testimony of Perry Ponder, P.E., when Plaintiff claims damages for enhanced injuries proximately caused by the defective product, and not the initial collision, evidence of initial accident-causing fault is irrelevant and unduly prejudicial. (Doc. 249, p. 8 n.4); *see Bearint ex rel Bearint v. Dorell Juvenile Group, Inc.*, 389 F.3d 1339, 1346–47 (11th Cir. 2004) (applying *D'Amario v. Ford Motor Co.*, 806 So. 2d 424 (Fla. 2001)). Defendants characterize the dispute as being about whether the defective inflator caused (i.e., enhanced) the injuries or whether a non-defective airbag would sustain the same injuries. Thus, the issue of negligence in causing the accident is moot.

representative. And Plaintiff is free to read Defendants' admissions into the record at trial. Defendants' concession does not, however, appear to fall within the scope of the doctrine of judicial estoppel.[3] Moreover, Plaintiff correctly notes that elsewhere in the record, Defendants deny that the inflator in the Subject Vehicle was defective when the vehicle was distributed. (Doc. 232, p. 6). For example, Plaintiff propounded a Request for Admission that the Takata airbag inflator incorporated into the Subject Vehicle and its front driver-side airbag system is defective. (*See* Doc. 232-2, p. 3; Doc. 232-3, p. 4). Both Defendants submitted a similar response to the Request for Admission:

> BMW . . . admits only that at the time of the subject motor vehicle accident the Takata airbag inflator incorporated into the [S]ubject [V]ehicle was defective. However, BMW . . . denies that the Takata airbag inflator incorporated into the [S]ubject [V]ehicle was defective at the time the [S]ubject [V]ehicle left BMW['s] . . . control.

(Doc. 232-3, p. 4; *see* Doc. 232-2, p. 3).

---

[3] "Judicial estoppel is an equitable doctrine invoked at a court's discretion, designed to protect the integrity of the judicial process." *Stephens v. Tolbert*, 471 F.3d 1173, 1177 (11th Cir. 2006) (quoting *Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 430 F.3d 1326, 1331 (11th Cir. 2005)). In *Anderson v. Brown Industries*, 614 F. App'x 415, 417–18 (11th Cir. 2015) (citing *New Hampshire v. Maine*, 532 U.S. at 749–51), the Eleventh Circuit noted that the Supreme Court has identified three factors for determining when judicial estoppel may be invoked: "(1) whether the present position is clearly inconsistent with the prior position; (2) whether the party persuaded the court to accept the earlier position, such that acceptance of the inconsistent position would create a perception that the court was misled; and (3) whether the party advancing the inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party." *See Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002); *see also Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007) ("Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants."). Pleadings as well as statements by parties and counsel in open court are equivalent to sworn statements for purposes of judicial estoppel. *Allapattah Servs. Inc. v. Exxon Corp.*, 372 F. Supp. 2d 1344, 1368 n.12 (S.D. Fla. 2005).

In the Final Pretrial Statement, Defendants double down on their theory that the Takata inflator was not defective when it left their hands and was first sold. (Doc. 257, p. 4). Defendants' Statement of Position asserts that only "after years of exposure to high heat and humidity, issues began to arise in vehicles manufactured by other original equipment manufacturers." (*Id.*). Thus, Defendants claim that a latent defect is not a defect until a tragedy strikes. So, Defendants admit in their *Daubert* Motion that the use of PSAN in an all-pyrotechnic automotive application, such as the Relevant Inflator, renders the component defective and unreasonably dangerous. They also admit that when combined with the lack of hermetic seals, rupture of the Relevant Inflator is inevitable. And they agree with Mr. Renz's first opinion that the root cause of the failures in the Relevant Inflators is the use of PSAN. They also agree with Mr. Renz's third opinion that this defect was present in the Relevant Inflator installed in Plaintiff's Subject BMW vehicle when it was manufactured and sold and caused the Relevant Inflator to rupture during the airbag deployment in Plaintiff's Subject BMW vehicle occurring on October 24, 2019. But, also, they claim this latent defect is not actionable until the defect manifests during an accident. This is patently absurd and negates the meaning of *latent* defect.[4]

---

4   This is like arguing that the Firestone P235/75R15 ATX, ATX II, and Wilderness AT tires installed on first-generation Ford Explorers which detreaded before the useful life of the tire expired, killing 238 people and injuring about 500 others, were not defective until the tread came off. The root cause of the tire failures was a poorly designed belt wedge and deficient antioxidants and anti-degradants that allowed the rubber composition to change over time, particularly in hot climates, with tires manufactured in Decatur failing the fastest. The defect existed the moment the tire left the factory floor, even if failure took time to manifest. Perhaps a simpler example is arguing that a time bomb is not dangerous until it stops ticking.

Nonetheless, Defendants have not stipulated that the subject inflator is defective, and Mr. Renz's first three opinions are relevant and helpful. Similarly, Mr. Renz's opinion that "all of the PSDI-4 PSAN inflators equipped in the BMW's vehicles, including the BMW Subject Vehicle, are defective and share a common and uniform defect" is relevant. (Doc. 210-1, ¶ 68). Defendants want to limit Mr. Renz to discussing only the Subject Vehicle and its defective inflator, arguing that Mr. Renz's "broad opinion" about other inflators is irrelevant. (Doc. 210, p. 13). Defendants miss the point that the scope of the defect is relevant to notice and punitive damages. (Doc. 232, p. 8); *see Kapila v. Warburg Pincus, LLC*, No. 8:21-cv-2362-CEH, 2022 WL 4448604, at *7 (M.D. Fla. Sept. 23, 2022) (finding expert testimony helpful under *Daubert* where it provided understanding about the background of the industry at issue in the case). Mr. Renz is expected to testify that PSAN's dangerous propensities have been well-known in the automotive industry for several decades. (Doc. 232-1, ¶¶ 24–25, 27, 35–66). Mr. Renz states in his report that BMW, via its management, "knew about the defective nature of PSAN before it built . . . Plaintiff's BMW vehicle." (*Id.* ¶ 65). Mr. Renz bases this opinion on design and development documents approved by BMW, BMW's internal communications, and corporate testimony. (*Id.* ¶¶ 65–66; *see id.* at pp. 27–28). Moreover, Defendants' expert, Mr. Lange, intends to discuss the history of the root cause investigations and recall, and he will opine that PSAN inflator propellant and

---

Defendants cannot hope to argue that a latent defect is not a defect until a crash occurs and the defect is manifested. The inflator ruptured which means the PSAN was defective. This is *res ipsa loquitur* at its finest.

6

exposure to thermal cycles and moisture flux render the inflators defective—an equally broad opinion as offered by Mr. Renz. (Doc. 202-1, pp. 21, 28).

### B. Mr. Renz's Fourth Opinion

Defendants challenge the admissibility of Mr. Renz's opinion that BMW knew about the defective nature of PSAN and the risk of injury it presented when it manufactured the Subject Vehicle and did not disclose the risk until May 2015. (Doc. 210, p. 14). Defendants do not question Mr. Renz's qualifications. Still, they assert that he relies on unspecified internal Takata emails that are "(1) impermissible hearsay that do [sic] not fall within a hearsay exception, and/or (2) does not relate to any relevant issue in this case." (Doc. 210, pp. 15–16). Defendants next aver that "Renz's fourth opinion is . . . one that does not help the Jury as it offers nothing more than mere argumentative statements on a matter that the Jury is perfectly capable of drawing its own independent conclusion on based on admissible evidence." (*Id.*). Defendants further contend that "Renz's fourth opinion is a one-sided summary of Takata documents that require no expertise to understand, will not assist the Jury, and is an opinion on the corporate intent of [t]he BMW Defendants." (*Id.* at p. 17).

Defendants' claim that Mr. Renz's opinions, at least in part, rely on Takata emails that do not fall within a hearsay exception is nothing more than a bald statement. Defendants do not identify a single email pertinent to Mr. Renz's fourth opinion and do not develop their argument that such documents do not fall within an exception to hearsay—such as the business records exception. The Court is not

7

obligated to address arguments not supported and properly developed, and such arguments are waived. *See W. Sur. Co. v. Steuerwald*, No. 16-61815-CV, 2017 WL 5248499 at *2 (S.D. Fla. Jan. 17, 2017); *see also U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (noting that the court need not consider "perfunctory and underdeveloped" arguments and that such arguments are waived).

Defendants' assertion that expert testimony is not required to understand the complex series of investigations conducted by NHTSA and third parties, culminating in rolling and ever-expanding recall notices, is disingenuous. Defendants retained Mr. Lange to conduct the same hermeneutical interpretation—to borrow a concept from biblical studies—of industry documents. Mr. Lange, like Mr. Renz, was retained to educate the lay jury on the timeline prepared by NHTSA following the first inflator ruptures in 2007, to understand the "fault tree analysis" outlining the methodology used to identify inflator failures, and to appreciate the scope of joint investigations undertaken by Takata and Honda in 2007 and 2008, including Honda's Part 573 defect letter, and NHTSA's Recall Query. (Doc. 202-1, ¶¶ 43–55(a)).

Mr. Lange also offers opinions on the expanded recall issued by Honda in 2010 and Takata's safety defect report issued in April 2013. (*Id.* ¶¶ 55(c)–57). Mr. Lange's testimony will educate the jury on Takata's root cause analysis which identified moisture and temperature in high absolute humidity regions as causing an increased propellant burn rate. (*Id.* ¶ 58). Finally, Mr. Lange explains how

8

Takata, with NHTSA's involvement, issued four Defect Information Reports confirming the defect was not limited to a VIN range and had nationwide implications—the latter being the very opinion offered by Mr. Renz that Defendants claim is irrelevant. (*Id.* ¶¶ 59–64). Mr. Lange will testify that based on his review of these complex proceedings and industry standards, Defendants could not have been aware that air bag systems supplied by Takata to BMW AG were defectively designed before Takata's announcement of defect findings in 2014. (*Id.* ¶ 75).

For good measure, Mr. Lange also volunteers the following regarding Defendants' state of mind:

> 66. OEMs would not have knowingly developed new products with defective Takata air bag inflators as each vehicle manufactured with a defective inflator must be remedied by recall and manufacturers cannot market vehicles with defects known to be related to motor vehicle safety. The prospect any vehicle manufacturer would knowingly integrate a known defective Takata inflator into an air bag system would be reflective of *irrational and irresponsible* behavior. Such a prospect is unreasonable.

(*Id.* ¶ 66 (emphasis added)). Notwithstanding Defendants' claim that Mr. Lange, their expert witness, is necessary to interpret technical documents pertaining to the root cause analysis and subsequent recall notices, they argue Plaintiff's expert "offers nothing more than mere argumentative statements on a matter that the Jury is perfectly capable of drawing its own independent conclusion on." (Doc. 210, p. 16). The Court found Mr. Lange's analysis of the documents and his interpretation of the data they convey regarding notice to BMW was based on a

sufficiently reliable methodology. (Doc. 256). The same is true for Mr. Renz. A lay jury cannot simply read root cause investigations conducted by NHTSA, Takata, and OEMs in conjunction with deposition testimony and correspondence to reach a conclusion as to Defendants' notice or knowledge of the latent defect presented in the Takata inflator.[5]

The Court also rejects Defendants' perfunctory argument that Mr. Renz's proffered opinions constitute legal conclusions or a "one-sided summary of Takata documents" culminating in an opinion on Defendants' intent. Experts are permitted to opine on ultimate issues such as state-of-mind when based on record evidence. *See, e.g.*, *Ploss v. Kraft Foods Grp., Inc.*, 637 F. Supp. 3d 561, 574–75 (N.D. Ill. 2022); *In re Takata Airbag Prod. Liab. Litig.*, No. 15-MD-02599-MORENO, 2022 WL 18956175, at *4 (S.D. Fla. Dec. 28, 2022) ("Therefore, the experts may opine as to what information was available and possessed by [d]efendants."). Mr. Renz's interpretation of the evidence forms his opinion as to Defendants' knowledge, just as it informed Mr. Lange's more favorable opinion of Defendants' state-of-mind.

---

[5] Curiously, when Defendants respond to Plaintiff's attack on Mr. Lange's methodology, they downplay the Court's role as a gatekeeper and argue: "The Court need not determine that the expert a party seeks to offer into evidence is irrefutably or certainly correct. Instead, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" (Doc. 231, pp. 4–5 (citations omitted)). Yet, when Defendants seek to exclude Mr. Renz, they emphasize the Court's gatekeeper function. (Doc. 210, p. 9 ("[T]he Advisory Committee notes reinforce that it is not appropriate for a court to dismiss challenges to the reliability of an expert's opinion as going to the weight, rather than their admissibility, of the opinion.")). In litigation, as in life, consistency matters.

To the extent Defendants raise other grounds to oppose Mr. Renz's opinion testimony, they are rejected.

## III. CONCLUSION

In sum, Defendants' Motion to Exclude the Testimony of Robert Renz, Jr. (Doc. 210) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on February 27, 2025.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties